**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| PATRICIA HAVERLY-JOHNDRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 1:13-cv-00108-JDL |
| ) | |
| BATH & BODY WORKS, LLC, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the Court is Bath and Body Works, LLC's ("BBW") Motion for Summary Judgment (ECF No. 24). After careful consideration, I deny BBW's motion.

I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that the Court shall grant summary judgment if the movant shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Carezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986)).

To demonstrate a genuine issue of material fact, Haverly-Johndro "must point to concrete, admissible evidence. Mere allegations, or conjecture unsupported in the record, are insufficient." *Rivera-Marcano v. Normeat Royal Dane Quality*, 998 F.2d 34, 37 (1st Cir. 1993) (citations omitted). "So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Calero-Carezo*, 355 F.3d at 19.

The "ground rules for summary judgment leave 'no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)' on the cold pages of the record." *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) (quoting *Greenburg v. P.R. Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir. 1987)). The record must be construed in the light most favorable to the non-movant and all reasonable inferences must be resolved in that party's favor. *See Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 153 (1st Cir. 2009).

## II. FACTUAL BACKGROUND

The parties' submissions make it apparent that there are disputed material facts concerning nearly every aspect of Plaintiff Patricia Haverly-Johndro's ("Haverly-Johndro") claims. This is evidenced by the following factual recitations, many of which are derived from Haverly-Johndro's Statement of Additional Fact,

that were properly supported with record references, and which are disputed by BBW.

BBW is a nationwide retailer specializing in personal care products and gift items. ECF No. 34-1 at ¶1. The company operates stores across the country, including in Maine. *Id.* at ¶2. Each store is led by a Store Manager who is assisted by members of a Store Leadership Team comprised of Co-Managers and Sales Leaders. *Id.* at ¶¶3, 4. Each Store Manager reports to a District Manager. *Id.* at ¶5.

Patricia Haverly-Johndro was hired as the Store Manager for BBW's Bangor, Maine store on May 10, 2010, after being interviewed by District Manager Colin Miller. *Id.* at ¶21. Soon after Haverly-Johndro was hired, she interviewed Ian Burke and Paula Graham as candidates for a Co-Manager position at the Bangor store. *Id.* at ¶¶34, 35. She selected Graham for the position because Graham had over 20 years of experience compared with Burke's year and a half of experience. *Id.* at ¶123. Miller had encouraged Haverly-Johndro to hire Burke and was unhappy when she hired Graham instead. *Id.* at ¶124.

Miller told Haverly-Johndro that the store's other Co-Manager, Carlie Moscone, "needed to go" and that Haverly-Johndro should look for an opportunity to put her on a performance improvement plan ("PIP"). *Id.* at ¶130. Haverly-Johndro followed his instructions, put Moscone on a PIP, and soon thereafter Moscone resigned. *Id.* at ¶131. Burke was then hired, *id.* at ¶ 39; Miller approved a starting annual salary of $41,500 for Burke. *Id.* at ¶133, Haverly-Johndro Dep., ECF No.

29-1 at 3, 9. The more experienced Graham was hired at an annual salary of $36,000. ECF No. 34-1 at ¶133.

Haverly-Johndro claims that Miller treated her inappropriately in a number of ways. She asserts that, after she was hired in May 2010, Miller told others that "I found my girl." *Id.* at ¶115. In June, Miller stated to Haverly-Johndro, "who is the sexy, attractive new Store Manager in Bangor?" and then gave her a big, unwanted, hug. *Id.* at ¶¶46, 127. Miller constantly hugged her and other female employees, and continued to hug Haverly-Johndro after she told him that she did not want to be hugged and wanted a handshake instead. *Id.* at ¶¶54, 128.

Haverly-Johndro contends that Miller favored Burke over female employees by not permitting Haverly-Johndro to discipline Burke for violating company policies, while requiring her to discipline female employees for less serious infractions. *Id.* at ¶135. On September 21, 2010, Miller told Haverly-Johndro, regarding Ian Burke, "Ian knows you hired [Graham] as Co-manager over him. Ian will listen to me because I'm male. Ian will not listen to you because you are a female." *Id.* at ¶142.

In October 2010, Haverly-Johndro was seated at a training session when Miller came up behind her, put his head on her shoulder and slid his face down onto her left breast, and whispered something to the effect of "do you need anything, is everything okay?" *Id.* at ¶¶58, 146. Around Halloween 2010, Miller saw a bikini on a mannequin in front of the Hot Topic store and asked Haverly-Johndro, "Are you going to wear this as your Halloween costume?" *Id.* at ¶¶47, 148. On or about

4

October 28, 2010, Miller told Haverly-Johndro that he "cherish[ed] her." *Id.* at ¶¶48, 149.

Haverly-Johndro claims that Miller often leered at her, looking at her up and down as if he was mentally undressing her. *Id.* at ¶¶60-62, 150. Further, Haverly-Johndro claims that Miller made numerous comments about how she was dressed. *Id.* at ¶151. On one occasion, Miller told Haverly-Johndro that her husband and the husbands of two other employees all "married up. I could never afford one of you." *Id.* at ¶¶49, 149.

In April 2011, Haverly-Johndro was given a performance evaluation by Miller that rated her as "does not meet expectations" on her ability to "coach and develop team members." *Id.* at ¶156. Haverly-Johndro challenged the rating because Miller had prevented her from coaching Burke. *Id.*

In May 2011, the Company transferred Miller to Minnesota for an assignment that was to last approximately four months. *Id.* at ¶157. Lyndsay Stafford ("Stafford"), the manager of another BBW store, was named the Acting District Manager. *Id.* at ¶158. Stafford and Miller had worked together for two years and Miller described Stafford as a "good friend" with whom he worked closely and for whom he served as a mentor. *Id.* at ¶¶159, 160.

After Stafford assumed her new position, Haverly-Johndro learned from Desinti Bates ("Bates"), the Store Manager of another BBW store, that Stafford was inquiring about the operations of the Bangor store. *Id.* at ¶68. On June 7, 2011, the night before Stafford visited the Bangor store, Haverly-Johndro called the

Company's ethics hotline having been told by Bates that she should do so to protect herself. *Id.* at ¶¶69, 164. Haverly-Johndro reported a number of grievances, including that (1) Burke was paid more than Graham, *id.* at ¶74; (2) Miller had told her numerous times that Burke will listen to him because he is a male, but will not listen to her because she is a female, *id.* at ¶76; (3) male employees were receiving preferential treatment over the females and that she was told to give female employees performance improvement plans for less significant performance issues, *id.* at ¶167; and (4) Miller had put his head on her shoulder and slid his face onto her left breast during a training session. *Id.* at ¶166. BBW's HR Manager Kasey Elliott ("Elliott") received a copy of the written report that resulted from Haverly-Johndro's call to the company's ethics hotline, *id.* at ¶77, and subsequently had a lengthy phone conversation with Haverly-Johndro about it on June 13, 2011. *Id.* at ¶¶80, 169.

Also in June, Haverly-Johndro sought Bates' assistance regarding how to code the hours for the newly-promoted Bangor BBW store Sales Leader Casey Snowman ("Snowman"). *Id.* at ¶¶82, 170. When Haverly-Johndro was first hired, Bates instructed her how to "re-code" employee hours from "productive time" involving sales to "onboarding time" involving training or meetings.[1] *Id.* at ¶¶117, 118. Based on the direction she received from Bates, Haverly-Johndro recoded

---

[1] BBW objects to the factual allegations regarding Bates' instruction to Haverly-Johndro as being hearsay. Because the summary judgment record supports the view that Bates' instructions to Haverly-Johndro on how to code employee hours related to a matter within the scope of Bates' duties as an employee, the instructions are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D); *see also Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8 (1st Cir. 1986) (noting statements by a non-managerial employee are encompassed by Fed. R. Evid. 801(d)(2)(D) when made on matters within the scope of her agency.).

6

Snowman's and Graham's hours regarding two work days in June. *Id.* at ¶¶171, 172.

Stafford visited the Bangor BBW store on June 16, 2011, and found timesheet reports reflecting that Haverly-Johndro had re-coded employee hours. *Id.* at ¶91. Stafford met with Haverly-Johndro and concluded that Haverly-Johndro had violated BBW policy by re-coding the hours and was untruthful by claiming that her actions were consistent with what she had been taught, was something she had done every week, and was the same practice as employed by other stores. *Id.* at ¶¶178-181. After first conferring with Elliott by phone, Stafford terminated Haverly-Johndro's employment. *Id.* at ¶182; Stafford Dep., ECF No. 25-15 at 12. Stafford testified that BBW has three levels of discipline for different types of infractions, beginning with a conversation, followed by written documentation, followed by termination. *Id.* at 8. Haverly-Johndro protested her firing and told Stafford that she assumed that Stafford was aware of her call to the Ethics Hotline. ECF No. 34-1 at ¶¶183, 184. Stafford indicated that she was not.[2] *Id.* at ¶184.

### III. DISCUSSION

Haverly-Johndro alleges that BBW discriminated against her on the basis of sex in violation of the Maine Human Rights Act by subjecting her to a hostile

---

[2] Haverly-Johndro asserts that she asked generally whether Stafford knew of her call to the ethics hotline. *See* ECF No. 29-1 ("[I] made the statement, and I presented it in a question format, that, I assume that you – you are aware of my call to the ethics hotline? Lyndsay Stafford's response was, no, I'm not. And I said, really? Okay.") BBW disputes this point, citing Stafford's deposition testimony wherein she claims Haverly-Johndro made a more specific assertion. *See* ECF No. 25-15 at 12 ("And when walking out she turned around and said to me, I know you know that I called ethics and you know what I said. And I said, no, I don't actually, and she walked out."). At her deposition, Stafford confirmed that Elliott told her Haverly-Johndro had filed an ethics hotline complaint, but denied knowing the substance of the complaint. *See* Stafford Dep., ECF No. 25-15 at 11.

7

workplace (Count I). She also claims that BBW retaliated against her for complaining of sexual harassment in violation of the Maine Human Rights Act and the Maine Whistleblower's Protection Act (Count II), and she asserts an unpaid wages claim pursuant to 26 M.R.S. § 626 (2013). Haverly-Johndro's claims arise primarily from the actions and comments of her immediate supervisor, District Manager Colin Miller ("Miller"). BBW's Motion for Summary Judgment challenges the legal sufficiency of Haverly-Johndro's claims, arguing that she has failed to prove a prima facie case of hostile work environment, unlawful retaliation, or her unpaid wages claim. Even if her underlying claims survive, BBW argues that Haverly-Johndro's claims for punitive damages must be dismissed.

1. Sexual Harassment Claim

The Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551-4634 (2013), provides that it is unlawful employment discrimination for an employer to discriminate against an employee on the basis of sex "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment." 5 M.R.S. § 4572(1)(A) (2013). The Law Court has cited the following elements for analyzing a sex discrimination claim based on a hostile work environment brought pursuant to the MHRA. The plaintiff must demonstrate:

> (1) that she (or he) is a member of a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in

> fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897, 903. While the conduct may be both severe and pervasive, Haverly-Johndro need only prove one of these qualities in order to prevail. *See Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976 (Me. 1996) ("The severity of the conduct may vary inversely with its pervasiveness. Whether the conduct is so severe as to cause the environment to become hostile or abusive can be determined only by considering all the circumstances, and this determination is left to the trier of fact.").

There is no dispute that the actions Haverly-Johndro complains of were subjectively offensive to her. Determining whether conduct is objectively hostile or abusive is not a mathematically precise test but

> must be answered by reference to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Subject to some policing at the outer bounds, it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment.

*Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 18-19 (1st Cir. 2002) (citations and internal quotation marks omitted). The First Circuit has clarified that while "behavior like fondling, come-ons, and lewd remarks is often the stuff of hostile environment claims . . . no particular types of behavior are essential to a hostile environment claim." *Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008) (internal citations omitted). Previous cases in which the First Circuit concluded

that a reasonable juror could find that the workplace was objectively hostile "do not establish a baseline that subsequent plaintiffs must reach in order to prevail." *Id.* at 49 (internal citation omitted).

BBW's motion primarily attacks the third, fourth, and fifth elements of the hostile work environment test. BBW disputes whether and to what extent Miller's remarks and conduct actually occurred, but argues that in any event, the acts do not rise to the level of actionable sexual harassment. Even if Haverly-Johndro's sexual harassment claim survives, BBW argues the record does not contain evidence of actual malice and her punitive damages claim should be dismissed. Haverly-Johndro responds that BBW takes an unfairly selective view of the evidence and urges the Court to consider the totality of the alleged harassment.

The various incidents testified to by Haverly-Johndro portray a situation where her position as Store Manager was negatively affected because of her status as a woman, and that Miller's alleged conduct was subjectively and objectively hostile and abusive. For instance, Haverly-Johndro asserts that Miller asked her "who is the sexy, attractive new Store Manager in Bangor?" ECF No. 34-1 at ¶46; asked her whether she was going to wear a bikini as her Halloween costume, *id.* at ¶¶47, 148; made numerous other comments about how she was dressed, *id.* at ¶151; told her that he "cherish[ed] her" *id.* at ¶¶48, 149; and would frequently leer at her up and down as if he was mentally undressing her. *Id.* at ¶¶60-62, 150.

In addition to Miller's alleged sexualized references to her appearance and clothing, Haverly-Johndro asserts that he constantly hugged her and other female

10

employees, even after she objected and asked for a handshake instead, *id.* at ¶¶54, 128, and that on one occasion Miller put his head on her shoulder, slid his face down onto her left breast, and whispered to her. *Id.* at ¶¶58, 146. Additionally, Haverly-Johndro asserts that Miller interfered with her supervisory authority by not permitting her to discipline Burke for violating company policies, while requiring that she discipline female employees for less serious violations. *Id.* at ¶135.

Taken together, such sexual comments, unwanted physical touching, and interference with Haverly-Johndro's work performance could lead a reasonable jury to find the existence of a pervasive hostile work environment. *See O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001) ("Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment."); *but cf. Marrero*, 304 F.3d at 19 ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins."). Determining the severity or pervasiveness of the alleged pattern of conduct involves questions that inevitably turn on credibility determinations and the weighing of disputed testimony. Applying the *Watt* standard to the largely disputed facts, I conclude that summary judgment is not in order.

2. Retaliation Claim

Under the Maine Whistleblowers' Protection Act ("MWPA"), "no employer may discharge . . . or otherwise discriminate against an employee . . . because[] the employee, acting in good faith, . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a

11

law." 26 M.R.S. § 833(1)(A) (2013).[3] To demonstrate a prima facie case of unlawful retaliation in violation of the MHRA and the MWPA, 26 M.R.S. §§ 831-840 (2013), Haverly-Johndro must demonstrate:

> [T]hat she engaged in statutorily protected activity; her employer made an employment decision that adversely affected her; and that there was a causal link between the protected activity and the adverse employment action. Further, if the adverse employment action happens in close proximity to the protected conduct, the burden shifts to the employer to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action.

*Watt*, 2009 ME 47, ¶33, 969 A.2d at 906. (Citations omitted). If BBW articulates a legitimate reason for the adverse employment action, "the burden remains with [Haverly-Johndro] to persuade the fact-finder that there was, in fact, a causal connection between the protected activity and the adverse employment action." *Id.* at ¶47.

BBW argues that neither Stafford nor Elliott knew of or had reason to know that Haverly-Johndro had engaged in any protected activity. BBW asserts that even if she could prove a prima facie case of retaliation, it has articulated a legitimate, non-discriminatory reason for terminating Haverly-Johndro – namely, she falsified employee time records. Thus, despite the close temporal proximity between her call to the Ethics Hotline and her termination, BBW asserts that Haverly-Johndro cannot show that the stated reason for her termination was pretextual.

---

[3] Although the MWPA itself provides no private right of action, complainants may, after appropriate administrative process, file a civil action under the MHRA. *See Schlear v. Fiber Materials, Inc.*, 574 A.2d 876, 878-79 (Me. 1990).

Viewing the facts in the light most favorable to Haverly-Johndro, a jury could reasonably conclude that her call to the Ethics Hotline ten days before she was fired was statutorily-protected activity. Contrary to BBW's argument, the fact that the written record of the call does not quote her as having used the words "sex discrimination" or "sexual harassment" is not determinative of whether the call constituted a protected activity. The written record of the phone call reflects that Haverly-Johndro reported Miller's statement that "Burke will listen to him because he is a male, but will not listen to HAVERLY-JOHNDRO because she is a female[;]" ECF No. 25-7 at 1; the pay disparity between the more experienced female co-manager hired by Haverly-Johndro and Burke; and she feared retaliation and that "the situation has become intolerable." *Id.* at 2. Haverly-Johndro asserts that she specifically informed the person who received the call that male employees were receiving preferential treatment over female employees. ECF No. 34-1 at ¶¶165, 167.

On these facts, a jury could conclude that Haverly-Johndro made "an oral report of what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of [Maine]" and was protected activity for purposes of the Maine Human Rights Act. 26 M.R.S. § 833(1)(A) (2013). In addition, based on the close temporal proximity between her protected conduct and the adverse employment action, a reasonable jury might conclude that Haverly-Johndro's report to the Ethics Hotline was the primary motivation for the termination of her employment.

BBW vigorously disputes any causal connection between the call and Haverly-Johndro's termination ten days later, emphasizing that Stafford terminated Haverly-Johndro for violating BBW's policy governing the coding of employee hours. BBW also asserts that Stafford was only aware of the existence of the Ethics Hotline report at the time she terminated Haverly-Johndro, but had not received any other information regarding the report.

Notwithstanding BBW's position, Haverly-Johndro has produced evidence that could establish that: she re-coded the hours in the manner she had been instructed; ECF No. 34-1 at ¶117; she believed that she was following the approach utilized at every store; *id.* at ¶121; the re-coded hours resulted in no adverse financial consequences for BBW; *id.* at ¶189; and she never received a written warning or other progressive discipline before being fired for this single violation of policy. *Id.* at ¶188.[4] Whether BBW followed a progressive disciplinary policy that it deviated from is a dispute of material fact which will factor into Haverly-Johndro's claim of pretext. *See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 143 (1st Cir. 2012) ("Evidence that standard procedure was not followed is directly relevant to [plaintiff's] burden of demonstrating pretext.").

Moreover, Haverly-Johndro produced evidence that Elliott told her that Stafford knew about her call to the ethics hotline at the time Stafford met with her, although Stafford denied knowing of the call. ECF No. 34-1 at ¶185. In addition,

---

[4] Stafford's testimony regarding BBW's progressive disciplinary policy, *see* ECF No. 25-15 at 8, seemingly contradicts the guide and code of conduct BBW adhered to. *See* ECF No. 25-3 at 5. ("All violations of our Code or company policies – no matter how trivial they may seem at the time – are harmful to the interests of the company and will be treated accordingly. Associates who violate the Code or other company policy are subject to disciplinary action up to and including termination of employment.")

Elliott, who had previously had a lengthy phone conversation with Haverly-Johndro concerning the Ethics Hotline report, advised Stafford to terminate Haverly-Johndro's employment minutes before Stafford terminated Haverly-Johndro. *Id.* at ¶¶169, 190; Stafford Dep., ECF No. 25-15 at 43. Combined with the aforementioned circumstantial evidence, this evidence could support a jury determination that BBW's stated reason for Haverly-Johndro's termination was pretextual. Accordingly, summary judgment is denied as to Haverly-Johndro's retaliation claim.

3. Punitive Damages

Haverly-Johndro seeks punitive damages for both the sex discrimination and whistleblowing claims. The Maine Human Rights Act provides that a complaining party may recover punitive damages if she demonstrates that the defendant engaged in a discriminatory practice "with malice or with reckless indifference to the rights of an aggrieved individual protected by this Act." 5 M.R.S. § 4613(2)(B)(8)(c) (2013). Malice or implied malice must be proven by clear and convincing evidence. *See Batchelder v. Realty Resources Hospitality, LLC*, 2007 ME 17, ¶ 27, 914 A.2d 1116, 1124.

BBW argues that that record contains no evidence of actual or implied malice, asserting that Haverly-Johndro has not alleged that any statements evincing ill will were made concerning her Ethics Hotline call or termination. ECF No. 24-1 at 20. Further, BBW claims that Haverly-Johndro's sexual harassment allegations are a series of off-hand, trite statements that are obviously not malicious. *Id.* Haverly-Johndro posits that a jury could find actual malice based on

the temporal proximity between her protected activity and termination, coupled with Stafford and Elliott's discussion of that activity prior to making the termination decision. ECF No. 29 at 18. Alternatively, Haverly-Johndro argues that BBW acted with reckless disregard to her rights by allowing her to be sexually harassed and by terminating her in retaliation for her complaints.

As indicated above, I conclude that a jury must determine whether BBW's explanation for Haverly-Johndro's termination was pretextual. Should a jury find that BBW's termination of Haverly-Johndro's employment was pretextual it could conclude that, in combination with all of the other relevant circumstances, there is clear and convincing evidence that BBW acted with malice or reckless indifference. Accordingly, summary judgment is denied as to this claim.

4. Unpaid Wage Claim

Maine's wage payment statute provides a cause of action for former employees to seek payment of unpaid wages from their employers upon severance of the employment relationship. *See* 26 M.R.S. § 626 (2013). Haverly-Johndro's unpaid wage claim relates to one day of vacation that she claims she was entitled to be paid for upon her termination from employment. The summary judgment record reflects a factual dispute as to whether Miller had previously agreed that Haverly-Johndro would be entitled to carry over eight hours of unused vacation time from 2010 to 2011. *See* ECF No. 34-1 at ¶¶194, 196. Accordingly, I cannot resolve the question of whether BBW should not have charged against Haverly-Johndro's 2011 vacation time the 8 hours of vacation time she used in March 2011.

IV. CONCLUSION

For the foregoing reasons, BBW's Motion for Summary Judgment is **DENIED**.

**SO ORDERED.**

**DATED THIS 30th DAY OF JUNE, 2014**

                                           /s/ Jon D. Levy
                                           **JON D. LEVY**
                                           **UNITED STATES DISTRICT JUDGE**